UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TRIDENT SEAFOODS CORPORATION, et. al., | CASE NO. C12-134 MJP |
| Plaintiffs, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| JOHN E BRYSON, et. al. | |
| Defendants. | |

This matter comes before the Court on the parties' cross-motions for summary judgment. (Dkt. Nos. 42, 43.)  Having reviewed the motions, respective responses and replies (Dkt. Nos. 43, 44, 46), all related papers, and having heard oral argument from the parties on November 19, 2012, the Court GRANTS Defendants' motion and DENIES Plaintiffs' motion.

**Background**

Plaintiffs own and operate on-shore fish processing plants in Kodiak, Alaska.  Asserting claims under the National Environmental Policy Act ("NEPA") and the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), Plaintiffs sued Defendants National

1   Marine Fisheries Service, National Oceanic and Atmospheric Administration, and John E.

2   Bryson as Secretary of Commerce (collectively "the Agencies") challenging the adoption of

3   Amendment 88 to the Fishery Management Plan for Groundfish of the Gulf of Alaska

4   ("Amendment 88").   Plaintiffs argue the Agencies violated NEPA by not considering the

5   Rockfish Pilot Program, a management plan whose statutory authority expired in 2011, as a

6   reasonable alternative to the final rule.   Other than their preference for the Pilot Program,

7   Plaintiffs do not allege the final rule, Amendment 88, violates the MSA.   Instead, Plaintiffs

8   challenge how the Agencies made that decision.

9       A.  Regulatory Framework

10      In the MSA, Congress found that "[c]ertain stocks of such fish have declined to the point

11  where their survival is threatened" and established a national program for the conservation of

12  fishery resources.  16 U.S.C. §1801(a)(2)(A).   Congress stated that this program was "necessary

13  to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term

14  protection of essential fish habitats and to realize the full potential of the Nation's resources."  16

15  U.S.C. § 1801(a)(6).   The purposes of the MSA include providing "fishery management plans

16  which will achieve and maintain, on a continuing basis, the optimum yield from each fishery,"

17  and establishing "Regional Fishery Management Councils" that would create, monitor, and

18  review these Fishery Management Plans.  16 U.S.C. § 1801(b)(4), (5).   The MSA provides the

19  Secretary with fishery management authority within the exclusive economic zone of the United

20  States. 16 U.S.C. § 1811(a).

21      The Secretary carries out his management and conservation duties through the National

22  Marine Fisheries Service ("NMFS") and eight Regional Fishery Management Councils

23  established by the MSA.  16 U.S.C. § 1852(a).   The Northern Pacific Fishery Management

24

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT- 2

1  Council (the "Council") covers the states of Alaska, Washington, and Oregon, and has authority

2  over fisheries in the exclusive economic zone encompassing the Arctic Ocean, Bering Sea, and

3  the Pacific Ocean seaward of Alaska.  16 U.S.C. § 1852(a)(1)(G).

4       The Council is required to prepare Fishery Management Plans and amendments to those

5  plans as necessary for the fisheries in its area.  16 U.S.C. § 1852(h)(1).  The Fishery

6  Management Plans must contain conservation and management measures deemed by the Council

7  to be "necessary and appropriate for the conservation and management of the fishery," and must

8  be consistent with the "national standards" described in the MSA.  16 U.S.C. § 1853(a)(1)(A).

9  In the present case, the Council, under the authority of Section 303(A) of the MSA, enacted a

10  limited access system to allocate fish harvesting privileges among eligible participants through a

11  system of transferable permits that can be sold on the open market.  16 U.S.C. § 1853(a), (b), (c).

12       In addition to complying with the substantive requirements of the MSA, NEPA requires

13  federal agencies "take a 'hard look' at the potential environmental consequences of the proposed

14  action."  Or. Natural Res. Council v. Bureau of Land Mgmt., 470 F.3d 818, 820 (9th Cir. 2006)

15  (quoting Klamath–Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 993 (9th

16  Cir. 2004)).  Through these procedural requirements, NEPA seeks to make certain that agencies

17  "will have available, and will carefully consider, detailed information concerning significant

18  environmental impacts, and that the relevant information will be made available to the larger

19  [public] audience."  N. Idaho Cmty. Action Network v. U.S. Dep't of Transp., 545 F.3d 1147,

20  1153 (9th Cir. 2008).  To those ends, NEPA specifically requires agencies to consider reasonable

21  alternatives to the proposed action.  42 U.S.C. § 4332(2)(C); Center for Environ. Law & Policy

22  v. U.S. Bureau of Reclamation, 655 F.3d 1000, 1013 (9th Cir. 2011).  But, NEPA does not

23

24  ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT- 3

mandate a particular result or that the federal agency make a particular policy choice.  Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 23 (U.S. 2008).

B. Gulf of Alaska Rockfish Fishery

The MSA fishery at issue in this case is the Gulf of Alaska Rockfish Fishery, which contains, among other species, Pacific ocean perch, pelagic shelf rockfish, and northern rockfish. Two management plans are relevant to this case:  the Rockfish Pilot Program and its replacement, Amendment 88.

1. Rockfish Pilot Program

In 2003 in response to a "race for fish" and an effort to stabilize the fish populations, Congress enacted P.L. 108-199, mandating the creation of a pilot program to recognize the historic participation of fishing vessels and historic participation of fish processors in the Gulf of Alaska Rockfish Fishery.  The mandate required:

> Such a pilot program shall: (1) provide for a set-aside of up to 5 percent for the total allowable catch of such fisheries for catcher vessels not eligible to participate in the pilot program, which shall be delivered to shore-based fish processors not eligible to participate in the pilot program; and (2) establish catch limits for non-rockfish species and non-target rockfish species currently harvested with pacific ocean perch, northern rockfish, and pelagic shelf rockfish, which shall be based on historical harvesting of such bycatch species. The pilot program will sunset when a Gulf of Alaska Groundfish comprehensive rationalization plan is authorized by the Council and implemented by the Secretary, or 2 years from date of implementation, whichever is earlier.

Section 802 of P.L. 108-199.

To comply with this mandate, the Council adopted a share-based management program, under which the total allowable catch was apportioned as exclusive shares to cooperatives comprised of catcher vessels and on-shore processors.  50 CFR Part 679.  The Pilot Program required catcher vessel cooperatives to form an association with the on-shore processor to which it had historically delivered the most rock-fish.  Under this system, known as "fixed linkages,"

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT- 4

catcher vessels could only deliver harvested fish to the on-shore processor within its own cooperative.  By requiring a catcher vessel to deliver its entire harvest to a particular processor, the Rockfish Pilot Program guaranteed some on-shore processors a certain portion of the total allowable catch and eliminated their competition for harvested fish to process.  Plaintiffs are on-shore processors who participated in, and benefited from, the Rockfish Pilot Program.  By the terms of the authorizing legislation, the Rockfish Pilot expired on December 31, 2011.

2.  Amendment 88

Before the expiration of the Rockfish Pilot Program, the Council began working on a replacement management plan.  Initially, the Council considered extending the Rockfish Pilot Program.  In September of 2009, at the request of the Council, the General Counsel for Defendant National Oceanic Atmospheric Administration ("NOAA"), provided a legal opinion about the statutory authority to continue the Rockfish Pilot Program.  The General Counsel's opinion advised that any new rockfish management program would need to be developed under the general authority of the MSA.  Further, the General Counsel advised Council it could not require fixed linkages between harvesters and on-shore processors, like those contained in the Rockfish Pilot Program, because that arrangement is akin to a processor quota and is not authorized by the MSA.  Based on this advice, the Council did not continue to consider fixed linkages.

The Council issued an Environmental Assessment considering four alternatives relating to catcher vessels and on-shore processors.  The Rockfish Pilot Program was not considered as an alternative.  The Council subsequently issued a Finding of No Significance, indicating the plan would have no environmental impact.

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT- 5

On December 27, 2011, Defendants issued the final rule, Amendment 88.  Although Amendment 88 is similar to the Rockfish Pilot Program, one key difference is the removal of the requirement for harvesters to deliver to a specific on-shore processor.  Instead, Amendment 88 contains a geographic requirement, permitting catcher vessels to deliver fish only to on-shore processors in Kodiak, Alaska.

C.  Procedural History

On January 24, 2012, Plaintiffs sued alleging Amendment 88 violates the MSA and NEPA, arguing the Agencies erred by (1) not including on-shore processing as a definition under the terms "fishing" and "fishery," and (2) failing to authorize Pilot Program's continuation.  Additionally, Plaintiffs claim the Agencies should have considered reasonable alternatives to the final rule, including the Rockfish Pilot Program, prepared an environmental impact statement, and considered the effects of all reasonable alternatives on the natural environment and the attendant socio-economic effects.   Plaintiffs ask the Court to "vacate the Final Rule implementing Amendment 88" and to reinstate the Rockfish Pilot Program pending reconsideration by the Council and approval by Defendants of a new rule.

Both parties now move for summary judgment.

**Discussion**

A.  Legal Standard

A court shall enter summary judgment in favor of a moving party if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).

Compliance with NEPA and MSA is reviewed under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701–706.  Under the APA, the reviewing court shall set aside agency

actions found to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A); <u>Native Ecosystems Council v. Dombeck</u>, 304 F.3d 886, 891 (9th Cir. 2002) (applying APA standard to NEPA and NFMA claims).  In determining whether an agency decision was arbitrary and capricious, the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  <u>Marsh v. Oregon Natural Res. Council</u>, 490 U.S. 360, 378 (1989).  Therefore, in deciding the parties' summary judgment motions, the Court applies the legal standards governing a review conducted pursuant to § 706(2)(A) and determines whether, as a matter of law, the Agencies' decision to approve and proceed with the regulation is arbitrary and capricious or violates the APA, NEPA, MSA, and their implementing regulations. <u>See, e.g.</u>, <u>Oregon Natural Res. Council v. Lowe</u>, 109 F.3d 521, 526 (9th Cir. 1997) (applying, in a review of the district court's summary judgment rulings regarding Forest Service's actions, the "arbitrary and capricious" standard to a NFMA challenge and the "hard look" standard to a NEPA challenge).

B.  <u>Standing</u>

Plaintiffs lack standing to bring a NEPA claim because their economic concerns fall outside the zone of interests protected by the statute.

Standing in an administrative review case is a two part inquiry.  <u>Ashley Creek Phosphate Co. v. Norton</u>, 420 F.3d 934, 937 (9th Cir. 2005).  First, Plaintiffs must show they meet Article III standing requirements by showing that the (1) an injury in fact that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) a likelihood that the injury will be redressed by a favorable decision.  <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.</u>, 528

1  U.S. 167, 180-81 (2000).  The parties do not dispute, and the Court agrees, that Plaintiffs have

2  Article III standing.

3       Plaintiffs have standing to bring a NEPA claim only if they also can also establish

4  prudential standing, which examines whether "a particular plaintiff has been granted a right to

5  sue by the statute under which he or she brings suit." City of Sausalito v. O'Neill, 386 F.3d 1186,

6  1199 (9th Cir. 2004).  Plaintiffs' NEPA claim is brought under the APA, which states, "a person

7  ... adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

8  entitled to judicial review thereof." 5 U.S.C. § 702.  The Supreme Court has interpreted this

9  section of the APA as imposing a prudential standing requirement that "the interest sought to be

10  protected by the complainant [must be] arguably within the zone of interests to be protected or

11  regulated by the statute ... in question."  Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397

12  U.S. 150, 153 (1970).

13       The zone of interest protected by NEPA is environmental.  Ashley Creek, 420 F.3d 934,

14  941 (9th Cir. 2005).  Consequently, the Ninth Circuit has held that purely economic interests do

15  not fall within NEPA's zone of interests: "[A] plaintiff who asserts purely economic injuries does

16  not have standing to challenge an agency action under NEPA." Nevada Land Action Ass'n, 8

17  F.3d at 716; see also Ranchers Cattleman v. United States Dep't of Agric., 415 F.3d 1078, 1102

18  (9th Cir. 2005) (an economic injury alone will not support a claim under NEPA); Western Radio

19  Servs. Co. v. Espy, 79 F.3d 896, 903 (9th Cir. 1996) (holding that a plaintiff whose only

20  complaint was that agency action would cause economic harm asserted an interest outside

21  NEPA's zone of interests); Port of Astoria, 595 F.2d at 475 (holding that injuries that were "only

22  pecuniary losses and frustrated financial expectations that [were] not coupled with environmental

23  considerations" were "outside of NEPA's zone of interests").

24

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT- 8

1    Plaintiffs' interests are unquestionably economic, not environmental.  According to the

2    Complaint, the adoption of Amendment 88 harmed Plaintiffs by "harming the conservation of

3    the resources and allocating 100% of the rents…to the vessel owners instead of allowing

4    Plaintiffs to share in those rents." (Dkt. No. 14 at ¶4.)  To establish standing, Plaintiffs offered

5    the declaration of Joseph Plesha, legal counsel for Trident Seafoods, who speculated as to the

6    potential harm caused by Amendment 88:

> Processors, therefore, will unavoidably bid up the prices for deliveries of rockfish
> and its associated bycatch such that they will cover only their variable costs of
> production of rockfish.  Virtually all the rents generated by the fishery will no
> longer be shared by on-shore processors but, instead, will be transferred
> exclusively to the vessel owners who receive rockfish harvesting quota.

(Dkt. No. 45 at ¶14.)  Plesha further explained that for Trident, the economic cost resulting from

Amendment has been a nearly tripling of the per pound payment for rockfish and a decrease in

"gross margins earned by Trident's plant." (Id. at ¶15.)  At oral argument, when asked by the

Court if more than money was at stake, Plaintiffs' counsel stated the harm suffered by Plaintiffs

was one of market capitalization.  Even applying prudential standings' low bar, Plaintiffs'

wholly economic interests fall outside of NEPA's environmental zone of interest.  See Ashley

Creek, 420 F.3d 941 (holding economic interests cannot be swept into NEPA's environmental

inquiry).

    The Court is not persuaded by Plaintiffs' assertion that so long as they establish standing

for the MSA claim, NEPA's standing requirement is also met.  In Nevada Land Action

Association v. U.S. Forest Service, 8 F. 3d 713 (9th Cir. 1993), the Ninth Circuit rejected this

identical argument:

> We reject NLAA's [Nevada Land Action Association's] suggestion that standing
> under NEPA may be derived from standing under NFMA [Forest Management
> Practices Act] because the two statutes are interconnected.  Although a provision

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT- 9

of NFMA does require compliance with NEPA, see 16 U.S.C. § 1604(g)(1) (1988), the statutory schemes are entirely separate. The "zone of interests" inquiry would be meaningless if standing under NEPA could be automatically derived from standing under other statutes which refer to NEPA.

Id. 8 F.3d at 716, n. 2. Likewise, here, Plaintiffs must show how their economic concerns fall within NEPA's zone of interest. Since Plaintiffs have failed to meet the burden of prudential standing, their NEPA claim is dismissed.

     C.  Remaining MSA claim

     Without standing to pursue a NEPA challenge to the Agencies' decision-making, Plaintiffs' MSA claim has no legs.  As alleged in Plaintiffs' Amended Complaint, the MSA claim is predicated on the Agencies' violation of NEPA:

> The opinion of Defendants with respect to Amendment 88 that on-shore processing is not included in the terms "fishing" and "fishery" is not in accordance with law and caused the Council and Defendants to approve Amendment 88 and to promulgate the Final Rule which arbitrarily and capriciously excluded a reasonable alternative from analysis and consideration under NEPA, thereby violating the requirement in section 304 of the Magnuson-Stevens Act, 16 U.S.C. §1854, that Amendment 88 and the Final Rule comply with applicable law.

(Dkt. No. 14 at ¶14.) Plaintiffs' briefing on summary judgment confirms the inter-relatedness of the claims, stating "Defendants have violated the MSA by not Complying with NEPA."  (Dkt. No. 44 at 9.) Thus, Plaintiffs MSA claim only exists to the extent this Court finds a violation of NEPA.  Plaintiffs do not argue the MSA independently required the Agencies to consider reasonable alternatives.  Nor do they argue Amendment 88 itself is deficient.  Because Plaintiffs lack standing for the NEPA challenge, the MSA claim relating to that challenge also fails.

**Conclusion**

     The Court GRANTS Defendants' motion for summary judgment because Plaintiffs lack standing to bring a NEPA claim.  Without this Court finding a NEPA violation, their MSA claim

1  also fails.  Plaintiffs' motion for summary judgment is therefore DENIED.  The clerk is ordered

2  to provide copies of this order to all counsel.

3

4          Dated this <u>30th</u> day of November, 2012.

5

6                                              Marsha J. Pechman
                                              Chief United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT- 11